**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**ERIC A. JACKSON,**

        **Petitioner,**

                                    **Civil Action 2:11-cv-72**
   **v.**                             **Judge James L. Graham**
                                      **Magistrate Judge Elizabeth P. Deavers**

**WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,**

        **Respondent.**


## REPORT AND RECOMMENDATION

      Petitioner, Erick A. Jackson, an Ohio inmate, was convicted in Union County, Ohio, of

Aggravated Murder and Possession of a Dangerous Ordnance.  He unsuccessfully petitioned all

levels of the state judiciary for postconviction relief.  This matter is before the United States

Magistrate Judge for consideration and issuance of a Report and Recommendation on Jackson's

Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF

No. 2), Respondent's Return of Writ (ECF No. 9), and Petitioner's Traverse (ECF No. 15).  For

the reasons that follow, it is **RECOMMENDED** that Jackson's Petition be **DENIED** and that

this action be **DISMISSED**.

### I.

      The Ohio Third District Court of Appeals summarized the facts underlying Jackson's

conviction as follows:

> It is undisputed that on October 15, 2002, Jackson shot his mother, Donna Levan ("Levan"), with a sawed-off twelve-gauge shotgun.  The shooting occurred in the parking lot of Levan's place of employment, the Heartland of Marysville Nursing and Rehabilitation Center, in Union County, Ohio.  There were no witnesses to the shooting.  Following the shooting, Jackson drove away from the scene, but he was shortly thereafter pulled over and arrested by a Union County Sheriff's deputy.  Levan died nine days after the shooting.

*State v. Jackson,* No. 14-03-28, 2004 WL 1717691, at *1 (Ohio App. 3d Dist. Aug. 2, 2004).

In October 2002, Jackson was indicted and charged with one count of aggravated murder and possession of a dangerous ordnance.  After consultation with counsel, who had reviewed some initial discovery in the case and interviewed his client, Jackson entered written pleas of not guilty and not guilty by reason of insanity.  (See Written Plea, Return of Writ, Exh. 3, ECF No. 9-1.)  At the request of Jackson's attorney, the court approved a psychiatric exam to determine Jackson's competence.  The state court set a trial date after the appointed psychiatrist deemed Jackson competent to stand trial.  In June 2003, the jury found Jackson guilty of all charges.  The state court sentenced Jackson to twenty-three years in prison.  Jackson appealed, challenging the State's presentation of gruesome images.  The Ohio appellate court affirmed Jackson's conviction, but remanded the action for re-sentencing.  *Id*. at *4.  In November 2004, the trial court, on remand, imposed a three-year sentence for the firearm specification to be served prior to and consecutive with a term of life imprisonment, with parole eligibility after service of twenty years and a concurrent one-year sentence for unlawful possession of a dangerous ordnance.  Jackson did not appeal his re-sentencing.

In February 2004, Jackson requested leave to file a motion for a new trial based upon his allegation that he had acquired newly discovered evidence from an previously unknown witness.  The trial court denied Jackson's motion as untimely.  Jackson appealed, and the state appellate

2

court affirmed the state trial court's judgment.  *State v. Jackson*, No. 14-04-11, 2004 WL 2260062, at *4 (Ohio App. 3d Dist. Sept. 27, 2004).  The Supreme Court of Ohio declined to accept Jackson's subsequent appeal.  *State v. Jackson*, 105 Ohio St.3d 1451 (2005).

In April 2004, Jackson, through counsel, filed a post-conviction petition to vacate or set aside judgment in the state trial court.  In support of this petition, Jackson alleged that his trial attorney provided ineffective assistance because he failed to conduct an adequate investigation. Jackson further alleged that had his counsel conducted an adequate investigation, counsel would have discovered Kaci Chaffin, an eyewitness whose testimony would have likely changed the outcome of his trial.  Jackson attached the affidavit of Ms. Chaffin to his petition.  Ms. Chaffin averred, in relevant part, as follows:

1.  * * * On October 15, 2002, I was employed by Heartland nursing home in Marysville, Ohio.  I was eight-months pregnant with my first child.

2.  I was acquainted with Donna Levan from working with her. Donna periodically discussed her son, Eric Jackson. She told me that he had drug problems and had attempted suicide.

3.  Eric Jackson came to Heartland, midday on October 15, 2002. Donna went outside to see him in the parking lot, saying he was probably going to ask her for money.

4.  I walked down the hallway to continue my work, when Annabelle Reed, a patient, told me I should come to the window and see what was happening in the parking lot between Donna and her son.

5.  From the window of Ms. Reed's room, I saw Donna fighting with her son. Mr. Jackson had the shotgun pointed to his own head. Donna was trying to pull the shotgun away from him.

6.  As Donna struggled with her son, the gun discharged and shot her hand off. At no time did Mr. Jackson appear to point the gun at his mother.

7.  I pulled the curtains closed and went to the bathroom to get sick. I called my grandfather and he picked me up from work soon thereafter.

8.      I was not aware that anything I saw was significant to the police investigation. I was never approached by the police or anyone else regarding the event.

9.      In October 2003, I was working at the Millcrest nursing home.  I spoke with Barbara Jackson, who I am casually acquainted with because she sometimes babysat me as a child.  She was discussing her husband when I realized that she was married to Eric Jackson. I told her what I saw on the day Donna was shot. In November 2003, I spoke with an investigator from the Ohio Public Defender and recounted the information contained in this affidavit.

(Chaffin Aff., ECF No. 9-1.)  Jackson also submitted the affidavit of his trial counsel, Jeffery M.

Holtschulte.  (ECF No. 9-2 at p. 9–10.)  Holtschulte averred, in relevant part, as follows:

2.      That * * * I was assigned through the Union County Public Defender system * * * to represent Eric Jackson, the Defendant in the above captioned matter [ State v. Jackson, Case No.2002 CR 0116];

3.      That Mr. Jackson was indicted in this matter on one count of Aggravated Murder and one count of Unlawful Possession of Dangerous Ordinance;

4.      That said indictment was based upon allegations that Mr. Jackson, on or about October 15, 2002, shot his mother with a sawed off shotgun in the parking lot of her workplace, Heartland Nursing Home, in Marysville, Union County, Ohio and she subsequently died as a result of the injuries she sustained;

5.      That Mr. Jackson indicated that he had no recollection of the actual shooting;

6.      That based upon the interviews with Mr. Jackson, his wife, his treating psychiatrist at the time and review of the investigation information provided in discovery, a defense theory was developed and Defendant entered a written plea of Not Guilty and Not Guilty By Reason Of Insanity;

7.      That witnesses identified and/or disclosed saw activity immediately before and after the shooting but none stated they saw the actual instant of the shooting;

8.      That no action was taken to search for other witnesses that had not been identified, discovered or voluntarily come forward;

9.      That I reviewed the affidavit of Kaci Chaffin, dated December 23, 2003, wherein she sets forth that she saw the actual instant of the shooting, but was not aware that what she saw was significant to the police investigation;

4

      10.     That had Kaci Chaffin been discovered or otherwise identified there is a reasonable probability that her testimony, as set forth in the affidavit, would have altered the theory of defense; she would have been called as a defense witness; and that said testimony would have been resulted in Mr. Jackson not being convicted of Aggravated Murder.

(Holtschulte Aff., ECF No. 9-2 at p. 9.)

On June 22, 2009, the trial court dismissed Jackson's post-conviction petition without holding an evidentiary hearing.  The trial court concluded that Jackson's trial counsel did not render ineffective assistance, reasoning as follows:

     Applying *Strickland*, this Court cannot conclude that Jackson's attorney performed deficiently.  Instead, it appears that Jackson's trial attorney diligently investigated the facts, witnesses, and theories of the case.  The fact that Jackson's attorney failed to discover a reluctant and silent witness does not rise to the level of ineffective assistance.  It would have been reasonable for Jackson's attorney to assume that an eyewitness to a fatal shooting in a nursing home parking lot would come forward to testify.

(*State v. Jackson*, Trial Court No. 02-CR-0116, Court of Common Pleas for Union County, Ohio (June 22, 2009), ECF No. 9-2 at p. 20.)  The trial court alternatively found that even if his trial attorney failed to conduct an adequate investigation, Jackson was not prejudiced by this failure. The trial court explained as follows:

     The timing and circumstances of Chaffin's affidavit raise serious credibility issues and make it unlikely that Chaffin's testimony would have affected the outcome at trial.  First, Chaffin avers that she "was not aware that anything [she] saw was significant to the police investigation." Chaffin Affidavit at ¶8.  This statement is irreconcilable with her assertion that she observed Jackson shoot his mother's hand off.  *Id*. at ¶6.  Furthermore, Chaffin's affidavit reveals that she only came forward after discussions with her friend and childhood babysitter - Jackson's wife Barbara.

(*Id*. at p. 20–21.)

Jackson appealed the trial court's dismissal of his petition, again arguing that his trial

counsel was ineffective for failing to conduct a reasonable investigation and also arguing that the trial court erred in dismissing his post-conviction petition without an evidentiary hearing.  The Ohio appellate court analyzed Jackson's ineffective assistance claim under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  With regard to the first prong, the Ohio appellate court held that "we are not persuaded that Jackson was provided ineffective assistance of trial counsel for trial counsel's failure to investigate for potential eyewitnesses outside of the State's discovery."  *State v. Jackson*, No. 14-09-24, 2009 WL 3720578, at *4 (Ohio App. 3 Dist. Nov. 9, 2009).  The Ohio appellate court noted that Jackson's trial counsel's investigation included interviews with Jackson, Jackson's wife, and Jackson' psychiatrist, as well as an investigation of the State's discovery.  The state appellate court concluded that Jackson's trial counsel's decision not to investigate beyond the information the State provided before developing his strategy for the defense was reasonable in light of the scope of the information the State provided.  The appellate court reasoned as follows:

> The State's initial discovery provided: a list of thirty-five (35) potential witnesses that could be called at trial; copies of police reports and narratives; copies of the witness statements; property custody documents; vehicle inventory documents; gunshot residue analysis; inventory of items obtained by search warrant; copies of vehicle identifications; and copies of related press releases and newspaper articles. (Doc. No. 12).  The State filed supplemental discovery several times.  (Doc. Nos.16, 19, 34, 40, 58, 62, 63, 66, 86, 103, 113).  We believe that trial counsel's decision to review and investigate those witnesses and evidence provided in the State's discovery filings – and not investigate outside of the evidence contained in these filings – was reasonable in light of all the evidence provided by the State during discovery. Based upon that evidence, trial counsel developed a theory of defense predicated upon Jackson's desire to commit suicide and his alleged mental defect. (June 24, 2003 Tr. at 30); (Holtschulte Aff. at ¶ 6, Doc. No. 164, Ex. A).  "[A]fter counsel chooses an adequate theory of defense, there is no duty to prepare for alternative theories." *State v. Heffernan*, 12th Dist. Nos. CA2005-11-104, CA2005-11-105, 2006-Ohio-5659, ¶ 15, citing *State v. Hoop*, 12th Dist. No CA2004-02-003, 2005-Ohio-1407, ¶ 30, citing *State v. Murphy*, 91 Ohio St.3d 516, 2001-Ohio-112, 747 N.E.2d 765.  Therefore, we cannot conclude that trial counsel failed to fulfill his duty of conducting a reasonable

investigation under *Strickland.*

*Id*. at *5.

The Ohio appellate court proceeded to analyze the second prong of *Strickland* as follows:

In addition, we cannot conclude that Jackson was prejudiced by counsel's failure to discover Chaffin. As an initial matter, we cannot conclude that the trial court abused its discretion by determining that Chaffin's affidavit was not credible.  . . .   In assessing the credibility of affidavits, the trial court should consider all relevant factors, including:

> (1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.

*Calhoun*, 86 Ohio St.3d at 285, 714 N.E.2d 905.  "[O]ne or more of these factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility.  Such a decision should be within the discretion of the trial court."  *Id.* The trial court found that Chaffin's relationship with Jackson's wife—a coworker and childhood babysitter—raised credibility issues (factor 4). We cannot find an abuse of discretion with that conclusion.  Furthermore, although not listed among the *Calhoun* factors, we find no abuse of discretion in the trial court's conclusion that Chaffin's statement that she "was not aware that anything [she] saw was significant to the police investigation" is inconsistent with what she averred she witnessed and raises serious credibility issues. (Chaffin Aff. at ¶ 8, Doc. No. 164, Ex. B).  Accordingly, we cannot find that the trial court abused its discretion in finding that Chaffin's affidavit was of questionable credibility.

Furthermore, we cannot conclude that Jackson was prejudiced by trial counsel's alleged failure to investigate.  The evidence at trial overwhelmingly supported the conclusion that Jackson purposefully killed his mother.  Deputy Lonnie Elmore of the Union County Sheriff's Department testified that when he stopped Jackson driving his car shortly after the shooting, Jackson stated, "I'm the one you're looking for.  I'm the one that did it.  I threw the gun out the window in the grass." (June 24, 2003 Tr. at 128-30).  When Deputy Elmore asked Jackson what he did,

Jackson replied, "[s]hot her * * * [m]y mother." (*Id*. at 132, 714 N.E.2d 905). Sheriff
Rocky Nelson testified that he heard Jackson state, "I did it * * * I shot her* * * my
mother." (*Id*. at 145–46, 714 N.E.2d 905).

Carla Rees, a Heartland employee who was working when the incident
occurred, testified to the following:

> Q: When you got outside, what did you see?
>
> A: Um, we ran around to Donna's car, and Donna was
> on the, she was on the ground. There was a guy had a belt around her
> right arm, and a lady had her shirt on her belly, putting pressure. Her
> whole right side of her hand was completely blown away. You could
> see the inside of her hand. Her thumb was barely hanging on the back
> of her hand. And when I got there, I hollered for some of the staff to
> go get some blankets to put on her, and I put her legs up, and she said,
> "Oh my God, I can't believe he would do this, and I said, "Who,
> Donna?," and she said, "My son, Eric," and she just kept saying, "Oh,
> my God, I'm going to die," and I said, "Donna, you're not going to
> die. You'll be okay."
> I kept trying to reassure her she wasn't going to die.
> She said three or four times that she was going to die, and she kept
> laying there, her head kept going back and forth. "Oh, my God, it
> hurts so bad." And I assured her, you know, that they were coming to
> help her, and when the medics got there, they took away that shirt that
> the lady had on her belly, and she had a big hole in the right side of
> her stomach, and she had had spaghetti for lunch that day, and it was
> all over her belly, all over the concrete around her. And she kept
> getting kind of shocky. She just kept kind of going out, and I kept just
> trying to help her, and she just [sic] saying, "My God, it hurts so bad,"
> you know, "I'm going to die."
>
> *          *          *
>
> Q: How many times did you hear her say who shot her?
>
> A: Twice. Once before the Chief got there, and then
> when he got there, he asked her point blank if she knew who shot her.
> She said, "Yes. My son," and he said, "who is your son?" She said,
> "Eric Jackson."

(*Id*. at 381–84, 714 N.E.2d 905). Alicia Davis, also a Heartland employee, testified,
in pertinent part:

8

Q: * * * Did you have occasion to go outside shortly before noon that day?

A: I went to my van.

Q: Why did you go to your van?

A: To get some change out, and to check on an employee that went out there, Donna.

Q: Okay. When you went outside, what did you see?

A: When I went outside, you know, went to my van, and Donna at that time was coming back, somebody she had met in the driveway, and we had met, and we were talking.

Q: So you saw her head back into the building?

A: Yeah, at that time. And so we stood in the driveway and talked about why she was out there, and-

Q: Okay. Without going into details of the conversation, did Donna go back inside at that time?

A: No.

Q: She stayed outside?

A: Correct.

Q: And what did you do?

A: We talked, and a car pulled up, and she went to the car that was, somebody that, that's who she was going to meet.

Q: Could you see who was in the car?

A: I could see just a shape, a shadow, but I couldn't see directly who was in the car.

Q: What did you see or hear after Donna went up to her car?

A: When Donna went to the car, I went to my van, and I could hear yelling, very belligerent yelling, screaming, hollering, the

9

person in the car hollering at her.

> Q: * * * Did you say you could identify this person as a man?

> A: It appeared to be a man.

> Q: Did you hear or see anything else between this person and Donna Levan?

> A: Yeah. When I heard the yelling going on, I looked out through the windows in my van, and I could see the person in the car grabbing at Donna, and Donna trying to pull away.

(*Id*. at 389–91, 714 N.E.2d 905).

Jackson, on the other hand, testified about meeting his mother Donna at Heartland as follows:

> A: * * * My next memory is coming from a side street – Heartland is on South Plum Street, which is the main entrance to their property. There is a side street on the other end of the parking lot that is not drawn.
> When I got to Heartland, and saw my mom outside, I pulled up to her.  She goes, "What do you need?"  I said, Well, I said – I've obviously planned to kill myself.  I wanted to say goodbye.  I am tired of not being able to provide for my family, and I wanted to be on speaking terms when I passed away.
> An argument broke out * * *
> My memory was obviously first on her own behalf, just trying to get her to understand that I was done, I did not want to move anymore, I was not working, that I wanted to be done.
> My rage got to a point that I still was not just getting a simple okay.  I remember reaching out, having ahold of my mother's smock jacket, and pulling my hand back, realizing that I haven't touched my mother since I gave her away at wedding December 3, 1986.

> I then saw the Mills Center building at the end of the parking lot through a clearing in the trees.

> Q: Are you familiar with the Mills Center?

> A: Yes.  I had been there for my suicide treatments

10

over the years.

I was looking at the building. My hands, just as they are now, my left hand on the steering wheel at 10:00 o'clock, my right hand on my gear shift in first gear, wanting to get help.

My mother's argument continued. I focused on getting help. * * *

At the end of my mother's argument I drove away, having a sight on the Mills Center the entire time, even as I drove away. There is no spot in my mind that will black out – there is no spot in my mind of even touching the gun while I was with my mother.

I drove away. I looked in the rearview mirror as I shifted gears, saw my mother doubled over. I could not pick up my eight-year-old daughter. I was going to jump out of the car because I thought my mother was having a heart attack from this argument, carry her to the Emergency Room. She raised up looking at me with her hand on her belly. I thought she was laughing at me. Got my car back in gear, and drove off, leaving my mother alive and laughing at me.

(*Id*. at 415-18, 714 N.E.2d 905). Jackson could not recall making any confession to Deputy Elmore and denied making any plans to kill his mother. (*Id*. at 419, 421, 439, 714 N.E.2d 905). On rebuttal, Dr. Chris Khellaf, a licensed psychologist, testified that he evaluated Jackson and concluded that Jackson had "pseudo-amnesia * * * meaning that it's not true amnesia * * * it is selective forgetfulness, it is fake amnesia." (*Id*. at 459–60, 480, 714 N.E.2d 905); (State's Ex. 54).

In light of the evidence presented that: Jackson admitted to shooting his mother and never claimed it was accidental; Davis' testimony that Jackson was arguing with his mother, and Jackson physically grabbed and pulled his mother toward the car; Jackson's mother's statement that her son shot her and never mentioning that it was accidental or that her son was attempting to commit suicide when it happened; and the fact that Dr. Khellaf testified that Jackson's amnesia was "fake," we are not persuaded that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, citing *Strickland*, 466 U.S. at 691. Nor is our confidence in the outcome undermined as a result of counsel's alleged shortcomings. *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373; *Strickland*, 466 U.S. at 694. Consequently, Jackson has failed to establish ineffective assistance of trial counsel, and therefore, a constitutional violation upon which post-conviction relief would be warranted.

*State v. Jackson*, 2009 WL 3720578, at *4-9. The Supreme Court of Ohio declined to accept

Jackson's subsequent appeal.  *State v. Jackson*, 124 Ohio St.3d 1508 (2010).

Jackson next filed the instant habeas petition with this Court, seeking relief under 28 U.S.C. § 2254.  Jackson advances a single claim of ineffective assistance of counsel. Specifically, he submits that his trial counsel rendered constitutionally ineffective assistance by failing to conduct an adequate pretrial investigation.  In support of this claim, Jackson points out that his trial counsel failed to conduct any investigation beyond reviewing the discovery provided by the State and speaking to Jackson, his wife, and his psychiatrist.  Jackson points out that the witness list included in the State's discovery identified two individuals employed at Heartland Nursing Home who saw events immediately before and after the shot was fired.  Jackson maintains that given that the shooting took place in the Heartland parking lot during the daytime, his trial counsel's failure to take the additional step of investigating the known class of Heartland residents with a window view of the shooting and employees who were working on the day of the shooting was unreasonable.  He contends that had his trial counsel taken this investigatory step, counsel would have discovered exculpatory eyewitness Kaci Chapman, an individual who was employed at the nursing home where the shooting took place and who witnessed the events from a resident's window.  Citing his trial counsel's affidavit testimony that counsel would have called Ms. Chaffin as a witness had counsel known about her and that in counsel's opinion, Chaffin's testimony would have likely resulted in Jackson not being convicted of aggravated murder, Jackson maintains he suffered prejudice as a result of his trial counsel's failure to conduct this investigation.

Jackson posits that the state appellate court unreasonably applied *Strickland* in holding that his trial counsel's failure to investigate was not ineffective assistance of counsel.  He

maintains that the evidence provided in the State's discovery (namely, the identification of two Heartland employees who saw events both right before and right after the shooting) would have led a reasonable attorney to investigate whether additional eyewitnesses could be discovered among the class of Heartland nursing home residents with a window view of the parking lot or employees who were on the premises the day of the shooting. Jackson adds that this is not a case where it was unlikely that investigation of the Heartland residents or employees would bear fruit so as to excuse his trial counsel's duty to further investigate. He therefore concludes that the appellate court "misapplied *Strickland* in holding that reliance [on] the State's discovery, in lieu of a thorough investigation into a known class of possible witnesses, was not deficient performance." (Traverse 11, ECF No. 15.)

Jackson further posits that the state appellate court "circumvented *Strickland's* prejudice analysis by unreasonably asserting that Kaci Chaffin is not a credible witness." (*Id*. at 13.) He maintains that nothing in the record reasonably indicates that Ms. Chaffin is not a credible witness. Jackson argues that Ms. Chaffin's chance encounter with his wife at another nursing home where the women were working does not evince a likelihood of collusion to commit perjury but rather is an event that "is likely not uncommon in a small town like Marysville, Ohio." (*Id*.) Jackson further contends that the state court's credibility concerns arising from Ms. Chaffin's failure to independently come forward sooner are unreasonable given that had his trial counsel conducted a reasonable investigation into who was present on the day and during the time of the shooting, Ms. Chaffin would have likely been discovered before the state court's credibility concerns would have arisen. Jackson argues that he was prejudiced by his counsel's failure to discover Ms. Chaffin as evidenced by the case-determinative, exculpatory nature of her

testimony. He submits that the exclusion of her testimony renders his conviction untrustworthy. In support of his assertion that the state appellate court's contrary finding was unreasonable, Jackson argues as follows:

> There is no evidence in the trial record regarding the actual moment of the shooting, so Ms. Chaffin's testimony would be the only evidence concerning what transpired. Whether the shooting was intentional or accidental is the central question of Mr. Jackson's case, and Ms. Chaffin's testimony concerning this question strikes at the heart of Mr. Jackson's conviction. A lawyer whose investigation fails to uncover and introduce existing evidence that would raise serious doubts concerning his or her client's conviction has provided ineffective assistance. . . . Ms. Chaffin's testimony, if believed, would raise such doubts, fully undermining the fairness of Jackson's conviction. As such, no matter how strongly supported by the existing record Mr. Jackson's conviction might be, the exclusion of Ms. Chaffin's testimony would call that record into question, undermining confidence in the result of the original trial.

(*Id*. at 16.)

In its Return of Writ, Respondent asserts that the state court reasonably determined that Jackson's trial counsel's performance was not deficient under the circumstances of the this case. In support of this assertion, Respondent asserts that the State provided extensive discovery that Jackson's trial counsel reviewed. Respondent also relies upon Detective Ropp's trial testimony that he "attempt[ed] to locate any Heartland employee/witnesses" and that he "review[ed] their statements and conduct[ed] supplemental interviews." (Return 23, ECF No. 9 (citing Trial Transcript 288–93, ECF No. 9-3).) Respondent submits that "[i]n light of the apparent comprehensiveness of the State's investigation, which included numerous witness statements, it was reasonable for counsel to rely on the state's discovery materials and conclude that further investigation was not likely to yield additional favorable witnesses." (*Id*.) Respondent further posits that the circumstances under which Ms. Chaffin was discovered—a chance encounter—further supports a finding that Jackson's trial counsel's failure to discover her was not

14

an abdication of his responsibility to investigate.  Respondent concludes that imposing a duty on counsel "to interview every nursing home employee or resident on the off chance that he or she might have been looking out the window at the exact time of the murder is unreasonable."  (*Id*.)

With regard to the second *Strickland* prong, Respondent asserts that Jackson was not likely prejudiced because Ms. Chaffin "may have been subject to impeachment and because of the weight of the evidence."  (*Id*. at 24.)  In support of this assertion, Respondent asserts that the "so-called chance encounter between Mrs. Jackson and Chaffin . . . suggested the possibility of collusion" and that Ms. Chaffin's averment that she was not aware that her testimony was significant to a police investigation "is simply implausible."  (*Id*. at 24–25.)  Respondent further argues that the strength of the evidence against Jackson weighs against a finding of prejudice.  Respondent points out that although the evidence suggested that Jackson "may have been suicidal . . . [and] that he contemplated taking his life at his father's grave and was meeting with his mother to say goodbye," there exists no record evidence suggesting "that he intended to commit suicide in front of his mother."  (*Id*. at 25 (citing Trial Transcript 409, 414–15, ECF No. 9-3).)  Respondent adds that "[i]n any event, his suicidal desires are not inconsistent with his proven desire to kill his mother."  (*Id.* at 25.)  Respondent highlights record evidence that reflects that immediately after the shooting, neither Ms. Levan nor Jackson expressed that the shooting was unintentional or part of a suicide attempt.  Respondent maintains that the fact that Jackson had not talked to his mother for over a year, that he used of a sawed-off shot gun, and that the policeman testified that Jackson threw the gun out of the car when the police approached further evidence his intentional killing of Levan.  Respondent concludes that the state court therefore reasonably determined that the prejudice prong of *Strickland* had not been satisfied.

## II.

### A.    Relief under 28 U.S.C. § 2254

Jackson seeks habeas relief under 28 U.S.C. § 2254.  The Antiterrorism and Effective

Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court

determinations.  The United State Supreme Court recently described AEDPA as "a formidable

barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court"

and emphasized that courts must not "lightly conclude that a State's criminal justice system has

experienced the 'extreme malfunction' for which federal habeas relief is the remedy."  *Burt v.*

*Titlow*, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)); *see*

*also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard

for evaluating state-court rulings, and demands that state-court decisions be given the benefit of

the doubt." (internal quotation marks, citations, and footnote omitted)).

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision

was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, or based on an unreasonable determination of the facts in light

of the evidence presented to the state courts."  *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner

must show that the state court's decision was "contrary to, or involved an unreasonable

application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show

that the state court relied on an "unreasonable determination of the facts in light of the evidence

presented in the State court proceeding").  The United States Court of Appeals for the Sixth

Circuit recently explained these standards as follows:

16

A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 120 S.Ct. 1495.

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with

the petitioner. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

"In order for a federal court to find a state court's application of [Supreme Court

precedent] unreasonable, . . . [t]he state court's application must have been objectively

unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21

(2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409 and

*Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 131 S.Ct. 770, 786

(2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so

long as "'fairminded jurists could disagree' on the correctness of the state court's decision."

(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of

"unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the

result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328,

341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d)

should be on the ultimate legal conclusion that the state court reached and not whether the state

court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d

230, 246 (5th Cir.2002) (en banc))); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir.

2013) (considering evidence in the state court record that was "not expressly considered by the

state court in its opinion" to evaluate the reasonableness of state court's decision).  Relatedly, in

evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a

court must review the state court's decision based solely on the record that was before it at the

time it rendered its decision.  *Pinholster*, 131 S.Ct. at 1398.  Put simply, "review under §

2254(d)(1) focuses on what a state court knew and did."  *Id.* at 1399.

**B.**     **Ineffective Assistance of Counsel**

As set forth above, Jackson advances a single claim of ineffective assistance of counsel.

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to

Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "Only a right to 'effective

assistance of counsel' serves the guarantee."  *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011)

(citation omitted).

The United States Supreme Court set forth the legal principals governing claims of

ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984).  *Strickland*

requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's

performance was deficient and that he suffered prejudice as a result.  466 U.S. at 687; *Hale v.

Davis*, 512 F. App'x 516, 520 (6th Cir. 2013).  A petitioner "show[s] deficient performance by

counsel by demonstrating 'that counsel's representation fell below and objective standard of

reasonableness.'"  *Poole v. MacLaren*, No. 12-1705, --- F. App'x ----, 2013 WL 6284355, at *5

(6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal

quotation marks omitted) and citing *Strickland*, 466 U.S. at 687).  To make such a showing, a

petitioner "must overcome the 'strong [] presum[ption]' that his counsel 'rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment.'" *Poole*, 2013 WL 6284355 at *5 (quoting *Strickland*, 466 U.S. at 687).  "To avoid the

warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576

F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

　　　To satisfy the second *Strickland* prong, prejudice, a petitioner "must 'show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.'" *Hale*, 512 F. App'x at 520 (quoting *Strickland*, 466 U.S. at 694).

"This means [a petitioner] must show a 'substantial, not just a conceivable, likelihood of a

different result.'" *Id*. (quoting *Pinholster*, 131 S.Ct. at 1403 (internal quotation marks and

citation omitted)).  Thus, this Court's review of ineffective assistance claims under § 2254(d) is

"'doubly deferential.'" *Id*. (quoting *Pinholster*, 131 S.Ct. at 1403 (internal quotation marks and

citation omitted)).

## C.　　Failure to Investigate

　　　Jackson's sole claim for ineffective assistance of counsel stems from his trial counsel's

decision to limit the scope of his investigation and his failure to seek out eyewitnesses who could

have potentially provided exculpatory evidence.  It is well settled that "'counsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary.'" *Poole*, 2013 WL 6284355 at *6 (quoting *Strickland*, 466 U.S. at

691).  "'This duty includes the obligation to investigate all witnesses who may have information

concerning his or her client's guilt or innocence.'" *Id.* at *6 (quoting *Towns v. Smith*, 395 F.3d

251, 258 (6th Cir. 2005)).  The duty to "'conduct a prompt investigation' exists regardless of 'the

accused's admissions or statements to the lawyer of facts constituting guilt.'" *Bigelow*, 576 F.3d

at 288 (quoting *Rompilla v. Beard*, 545 U.S. 374, 387 (2005)).

When, "as in *Strickland*, counsel attempt to justify their limited investigation as reflecting a tactical judgment," the Court must analyze "the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 690–91). The *Strickland* Court explained as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  .  .  .  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91. "[W]hile [objective standards of reasonableness] do[] not require counsel to investigate every conceivable defense," it is well settled that "[c]ompetent counsel can be expected to undertake a 'thorough investigation of law and facts relevant to plausible options' for the defense." *Couch*, 632 F.3d at 246 (quoting *Strickland*, 466 U.S. at 690). Put another way, "[w]hile the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it." *Id*. at 246 (citations omitted); *Ramonez*, 490 F.3d at 488 ("[A] central teaching of *Strickland*, as reaffirmed by *Wiggins* . . . [is] that the investigation leading to the choice of a so-called strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation."); *Towns*, 395 F.3d at 258 ("A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." (internal quotation marks and citation omitted)).

20

When evaluating failure-to-investigate claims, "'[t]he focus . . . is the reasonableness of the investigation (or lack thereof).'"  *Hale*, F. App'x at 520–21 (quoting *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010); *Bigelow*, 576 F.3d at 287 (quoting *Strickland*, 466 U.S. at 691) ("[T]he ultimate inquiry is whether the choice not to conduct additional investigation was 'reasonable[] in all the circumstances . . . .").  "'In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'"  *Hale*, 512 F. App'x at *4 (quoting *Wiggins*, 539 U.S. at 527)); *see also Bigelow*, 576 F.3d at 289 (citing *Wiggins*, 539 U.S. at 524, 534) (assessing reasonableness of counsel's investigation decisions "in light of the extent and results of the earlier investigation."); *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires [a court] . . . to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  Finally, as with any ineffective assistance claim, a court evaluating a failure-to-investigate claim must determine whether a petitioner has "overcome the strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id*. (internal quotation marks and citation omitted).

### III.

Applying the foregoing standards, the Undersigned concludes that the record provides no basis upon which this Court could rule that the state appellate court's determination was objectively unreasonable.  As set forth above, "review under § 2254(d)(1) focuses on what the state court knew and did."  *Pinholster*, 131 S.Ct. at 1399.  In rendering its decision, the state

appellate court reviewed "the trial court's judgment, the affidavits [of Ms. Chaffin and Jackson's trial counsel], the record, and all of the documentary evidence listed in R.C. 2953.21(C)."[1]  Citing Jackson's trial counsel's affidavit, the state appellate court found that Jackson's trial counsel "developed a theory of defense predicated upon Jackson's desire to commit suicide and his alleged mental defect" and that counsel developed this theory "based upon his interviews with Jackson, Jackson's wife, and Jackson's treating psychiatrist at the time, as well as an investigation of information provided in [the State's] discovery." *Jackson*, 2009 WL 3720578 at *5 (citing Holtschulte Aff. ¶ 6).  The state appellate court concluded that Jackson's trial attorney's "decision to . . . not investigate outside of the evidence contained in [the State's discovery] filings [and interviews of Jackson, Jackson's wife, and Jackson's treating psychiatrist] was reasonable in light of all the evidence provided by the State during discovery." *Id*.  The Ohio appellate court explained that the State's initial discovery included, among other evidence, "a list of thirty-five (35) potential witnesses that could be called at trial; copies of the police reports and narratives; [and] copies of the witness statements . . . ." *Id*.  The state appellate court further noted that "[t]he State filed supplemental discovery several times" and identified eleven docket entries reflecting the prosecuting attorney's filing of supplemental discovery.  In concluding that Jackson's trial counsel fulfilled his *Strickland* duty to conduct a reasonable investigation prior to choosing to pursue an insanity defense, the state appellate court noted that "'[a]fter counsel chooses an adequate theory of defense, there is no duty to prepare for alternative theories.'" *Id*. (quoting

---

[1]Ohio Revised Code Section 2953.21(C) includes the following types of documentary evidence: "the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."  Ohio Rev. Code. § 2953.21(C).

*State v. Heffernan*, 2006-Ohio-5659, ¶ 15 (Ohio Ct. App. 12th Dist. 2006) (additional citations omitted)).

The Undersigned finds that the Ohio appellate court reasonably concluded that Jackson's trial counsel's investigatory decisions constituted an exercise of reasonable professional judgment.  It is undisputed that Jackson's trial counsel premised his defense theory upon his interviews with Jackson, who was professing amnesia and had a record of mental illness, Jackson's wife, and Jackson's psychiatrist, along with his review of the State's discovery. (Holtschulte Aff. ¶ 6, ECF No. 9-2 at p. 9–10.)  Thus, this case is readily distinguishable from those cases in which the trial counsel completely failed to conduct an investigation.  *See, e.g.*, *Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008) (finding ineffective assistance arising from constitutionally inadequate investigation where counsel never personally contacted any of the alibi witnesses who were all known to him).  Further, it is not disputed that Jackson informed his trial counsel that "he had no recollection of the actual shooting," (Holtschulte Aff. ¶ 7, ECF No. 9-2 at p. 9–10), a factor that certainly bears on the reasonableness of his trial counsel's strategic decisions.  *See Strickland*, 466 U.S. at 691 ("[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.").  Nor is it disputed that the State's discovery identified "witnesses [who] saw activity immediately before and after the shooting, but none stated they saw the actual instant of the shooting." (Holtschulte Aff. ¶ 7, ECF No. 9-2 at p. 9–10.)  Significantly, Jackson identifies no record evidence that would indicate that the police or prosecution conducted an inadequate investigation.  To the contrary, Detective Ropp testified at trial that he "attempt[ed] to locate any Heartland employee/witnesses"

23

and that he "review[ed] their statements and conduct[ed] supplemental interviews."[2]  (Trial

Transcript 288–93, ECF No. 9-3.)  Under these circumstances, the Undersigned finds that the

state appellate court reasonably concluded that Jackson's trial counsel's investigatory decisions

did not constitute ineffective assistance but were rooted instead in a reasonable trial strategy.  *See*

*Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable . . . .").

Jackson's contention that his trial counsel should have discovered witness Kaci Chaffin

impermissibly asks this Court "to allow Monday-morning quarterbacking of defense counsel's

strategic decisions."  *Couch*, 632 F.3d at 246 (citations omitted).  Moreover, as the Sixth Circuit

recently emphasized, "counsel cannot be expected to investigate a defense or a witness unknown

to him. . . .  The duty to investigate does not force defense lawyers to scour the globe on the off

chance something will turn up."  *Hale*, 512 F. App'x at 520–21; *see also Jacobs v. Horn*, 395

F.3d 92, 122 (3d Cir. 2005) ("The right to counsel does not require that a criminal defense

attorney leave no stone unturned and no witness unpursued." (internal quotation marks and

citation omitted)); *Chandler v. United States*, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000) (en

banc) ("[C]ourts must recognize that counsel does not enjoy the benefit of unlimited time and

resources." (citation omitted)); *cf. Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009) ("[T]his

Court has never required defense counsel to pursue every . . . defense, regardless of its merit,

viability, or realistic chance for success.").

_____

[2]The Undersigned acknowledges *Strickland* mandates that this Court "evaluate the
conduct from counsel's perspective at the time," 466 U.S. at 689, and that Jackson's trial counsel
would not have had the benefit of  Detective Ropp's trial testimony during his pretrial
investigation.  Nevertheless, Detective Ropp's testimony underscores the unpersuasiveness of
Jackson's contention that his counsel's investigation was constitutionally inadequate.

24

In sum, Jackson has failed to satisfy his burden to demonstrate that the "State's criminal justice system has experienced the extreme malfunction" necessitating the federal habeas relief he seeks.  *Titlow*, 134 S.Ct. 10, 16 (internal quotation marks and citation omitted).  Because Jackson must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, the Undersigned's finding that he has failed to satisfy the performance prong obviates the need to consider whether he has established the prejudice prong.  It is therefore **RECOMMENDED** that Jackson's petition be **DENIED**.

## IV.

In sum, for the reasons set forth above, it is **RECOMMENDED** that Jackson's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 2) be **DENIED** and that this action be **DISMISSED**.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . ." (citation omitted)).

        The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

        **IT IS SO ORDERED.**


Date:  January 28, 2014                              _____/s/ *Elizabeth A. Preston Deavers*_____
                                                          Elizabeth A. Preston Deavers
                                                          United States Magistrate Judge